Rafael Martínez Nadal y Fernando J. Géigel, Presidente
y Secretario, respectivamente, del Partido Constitucional
Histórico, peticionarios, v. Eduardo J. Saldaña, Secreta-
rio Ejecutivo de Puerto Rico, demandado.

No. 224.—*Visto:* Agosto 15, 1924. *Resuelto:* Agosto 22, 1924.

1. Mandamus—Cuestiones Sujetas a Mandamus y Propósitos del Remedio—
   Actos y Procedimientos de Funcionarios Públicos, Juntas y Municipios—
   Elecciones—Restricción del Sufragio.—Conferido por nuestra Carta Orgá-
   nica a los electores capacitados de la Isla el derecho de votar, la Legislatura
   sólo puede regular pero no anular el derecho constitucional de dichos elec-
   tores, y el requisito del 10 por ciento de firmas que, para nombrar candidatos
   por petición, requiere la Ley No. 2 de 1924 (p. 37) es irrazonable, priva al
   electorado de su derecho a votar, y es inconstitucional y nulo. (Opinión del
   Juez Asociado Señor Wolf, actuando en funciones de Juez de turno.)
2. Mandamus—Jurisdicción, Procedimientos y Remedio—Petición de Manda-
   mus—Alegación en Cuanto al Requerimiento y Negativa del Funcionario
   Demandado.—Cuando el derecho que se alega es de carácter público, puede
   solicitarse un auto de *mandamus* sin necesidad de alegar en la petición el
   requerimiento ni la negativa del funcionario contra quien va dirigido. (Opi-
   nión del Juez Asociado Señor Wolf, actuando en funciones de Juez de turno.)
3. Mandamus—Jurisdicción, Procedimientos y Remedio—Petición de Manda-
   mus—Mayor Especificación en las Alegaciones.—Alegándose en una peti-
   ción de *mandamus* que determinada ley infringe nuestra Carta Orgánica y
   restringe el derecho al voto, y existiendo en ésta varias disposiciones que
   confieren tal derecho, no es necesario mayor especificación en cuanto a los
   preceptos en particular que se suponen infringidos. (Opinión del Juez Aso-
   ciado Señor Wolf, actuando en funciones de Juez de turno.)
4. Mandamus—Jurisdicción, Procedimientos y Remedio—Jurisdicción en Ca-
   sos Extraordinarios.—Como en el caso de autos, las cortes conocerán de un
   procedimiento de *mandamus* para resolver cuestiones antes de que se haya
   requerido o rehusado el cumplimiento de algún acto sólo en casos muy excep-
   cionales y extraordinarios, cuando la negativa a conocer de dicho procedi-
   miento podría y probablemente resultaría en que la resolución de la corte
   no tenga fin práctico alguno. (Opinión del Juez Asociado Señor Wolf, ac-
   tuando en funciones de turno.)

Solicitud de auto de *mandamus* al Hon. Adolph G. Wolf, Juez Aso-
ciado, en funciones de juez de turno, a fin de que la inscripción
de las candidaturas de los partidos políticos se efectúe de acuerdo
con las prescripciones de la Ley No. 79 de junio 25, 1919 (p.
531), y no de la Ley No. 2 de la sesión extraordinaria de junio
18, 1924 (p. 37), y para que se declare la nulidad de esta última.

Expedido el mandamiento alternativo en agosto 22, 1924 se
señaló el 27 del mismo mes para oir a las partes y para que el
demandado alegara las razones que tuviera para no expedir un
auto perentorio.

En la comparecencia celebrada el 27 de agosto el secretario del tribunal informó al Sr. Juez habérsele entregado en ese momento por el abogado del demandado una contestación al auto alternativo, y expresándose dicho abogado de acuerdo con dicha contestación, en el sentido de que el caso debía ser conocido por el tribunal en pleno, solicitó del Sr. Juez que así lo ordenara. Entendiendo el Hon. Juez en vista de la contestación, que no tenía facultad para seguir por sí mismo conociendo del caso, *resolvió* que se diera cuenta al tribunal en la próxima sesión.

*Cayetano Coll y Cuchí,* abogado de los peticionarios; *Hon. Attorney General, Miguel A. Muñoz, C. Llauger Díaz* y *J. A. Fernández,* abogados del demandado.

OPINIÓN EMITIDA POR EL JUEZ ASOCIADO SEÑOR WOLF, actuando en funciones de juez de turno.

El objeto fundamental de esta petición, como fué enmendada, es obtener para el "Partido Constitucional Histórico" el derecho a nominar candidatos por petición. Sostienen los peticionarios que la Ley No. 2 de la Sesión Extraordinaria de la Legislatura de 1924 titulada "Ley para enmendar la sección 37 de la 'Ley de Inscripciones y Elecciones,' . . . ." es anticonstitucional y nula. La súplica de la petición es que se ordene al Secretario Ejecutivo de Puerto Rico que haga caso omiso de dicha Ley y proceda a hacer las inscripciones de los partidos políticos de acuerdo con la Ley No. 74 de julio 30, 1923. Las dos cuestiones substanciales presentadas en esta petición, dejando a un lado momentáneamente todas las cuestiones de forma o de procedimiento, son las siguientes:

Si existe algo en la ley fundamental de Puerto Rico que impida a la legislatura limitar el derecho del sufragio en Puerto Rico; y

Si la Ley de 1924 constituye una invasión injustificada de los derechos del electorado y por tanto es anticonstitucional.

1.

Antes de discutir cualquiera de las cuestiones fundamen-

tales o subsidiarias envueltas en esta petición, parece conveniente mencionar primero la cuestión de jurisdicción. La tradición de esta corte era que si bien un juez asociado individualmente podría expedir un auto de *mandamus* para ser devuelto diligenciado a la corte, dicho juez no tenía por sí mismo derecho a resolver las cuestiones envueltas en una petición de *mandamus* o para dictar el auto perentorio. El razonamiento de los peticionarios acerca de la presentación de la petición y el nuevo examen de la ley, algo me hizo dudar. De un examen en conjunto me inclino a volver a mi idea original de este auto, aunque en la expedición del mandamiento que acompaña a esta opinión dejaré la cuestión abierta a discusión: en otras palabras, dispondré que el auto sea devuelto diligenciado a ''la corte,'' lo que puede interpretarse que significa, según sea el caso, ya el juez individual o la corte en pleno.

El argumento principal de los peticionarios en este sentido fué que si un juez tenía derecho a expedir el auto, también lo tenía para resolverlo. Sin embargo, sin detenerme ahora a comprobar la cuestión en los libros, estoy enteramente seguro de que varios autos pueden ser expedidos por una corte de apelación por jueces individuales y devueltos diligenciados ante el tribunal en pleno. Por mi misma experiencia o lectura sé que jueces individuales de la Corte Suprema de los Estados Unidos han expedido de este modo autos de error, procedimientos en bancarrota y, si no estoy equivocado, autos de *habeas corpus.* En muchos casos, necesariamente, y en época de vacaciones, tales facultades pueden fácilmente dejarse a jueces individuales y es un modo conveniente de evitar que se tome todo el tiempo de la corte. La duda que tengo en favor de los peticionarios es el texto literal de la ley de *mandamus,* el hecho de que esta corte está en vacaciones, y que la ley requiere, con cierto fin que no se revela enteramente, que uno de los jueces de la Corte Suprema de Puerto Rico permanecerá siempre en la capital.

Las razones por las cuales me inclino a convenir con el

Fiscal General de que un juez individual no debe dictar una resolución definitiva, son, primera, que el artículo 1 de la ley de *mandamus* ordena que el auto sea dictado por el Tribunal Supremo o por las cortes de distrito de Puerto Rico. Un juez individual no es la Corte Suprema y en la fecha en que fué aprobada la ley de *mandamus* en el año 1903 el juez de distrito no era la corte de distrito. En 1903 las cortes de distrito estaban constituídas por tres jueces. En toda la ley es de la "corte" de la que se habla en general, y si bien las palabras "la corte" podrían significar un juez individual si tuviera facultad para compeler al demandado, sin embargo, cuando se usa de tal modo en la ley la palabra "corte," creo que debe considerarse en oposición a un juez en particular que tiene el derecho a expedir el auto en primer término.

Sería un corolario de esta proposición que un juez individual no tuviera derecho a castigar por desacato. El lo tendría si ha de considerársele como la corte.

Acerca de la omisión en prescribir la ley algún recurso para ante el tribunal en pleno en el caso de que un juez individual de la Corte Suprema dicte un auto perentorio de *mandamus*. En la ley de *habeas corpus* se prescribe sobre una apelación contra la resolución de un juez individual. Nada se dispone en la ley de *mandamus*. Las apelaciones en Puerto Rico o se fijan directamente por la ley contra las cortes de distrito, o expresamente se autorizan como en la ley de *habeas corpus*. En manera alguna es un juez de la Corte Suprema, al expedir el auto, un funcionario de una corte inferior contra el cual pudiera interponerse apelación a la Corte Suprema. Difícilmente hubiera sido la intención de la legislatura haber conferido a los jueces individuales tal facultad completa sin prescribir acerca de una apelación.

Si yo hubiera estado enteramente satisfecho de la anticonstitucionalidad de la Ley de 1924, hubiera ordenado la expedición de un auto alternativo primeramente para que fuera devuelto diligenciado a la corte, pero como la pri-

mera parte del auto alternativo es mandatoria en su forma y de este modo es algo semejante a una expresión preliminar de opinión por el juez que lo expide, no quise librar el auto en dicha forma alternativa sin oir primero a las partes con respecto a la constitucionalidad de la indicada ley. Las partes comparecieron ante mí el día 15 de agosto de 1924 y discutieron las varias cuestiones envueltas.

2.

[1] Los artículos 26, 27, 28, 29, 35 y 36 de la Ley Orgánica, en tanto son pertinentes, prescriben lo siguiente:

"Art. 26.—El Senado de Puerto Rico se compondrá de diez y nueve miembros elegidos, por el término de cuatro años, por los electores capacitados de Puerto Rico. Cada uno de los siete distritos senatoriales definidos más adelante, tendrá el derecho de elegir dos senadores, y además de ese número se elegirán cinco senadores *at large*. . . . .

"Art. 27.—La Cámara de Representantes de Puerto Rico constará de treinta y nueve miembros elegidos cada cuatro años por los electores capacitados de Puerto Rico, según más adelante se dispone. Cada uno de los distritos representativos que más adelante se proveen, tendrá el derecho de elegir un representante, y además de ese número se elegirán cuatro representantes *at large*. . . . .

"Art. 28.—Para los efectos en lo futuro de las elecciones para miembros de la Asamblea Legislativa, se dividirá la isla de Puerto Rico en treinta y cinco distritos representativos, compuestos de territorios contiguos y compactos, y establecidos, hasta donde sea practicable, sobre la base de igualdad de población. La división y demarcación de tales distritos se harán por el Consejo Ejecutivo de Puerto Rico. . . . .

"Art. 29.—Las próximas elecciones en Puerto Rico se celebrarán el año mil novecientos diez y siete, el día 16 de julio. En ellas se elegirán los senadores y representantes, un Comisionado Residente en los Estados Unidos y dos Comisionados de Servicio Público, según se provee en esta Ley. Después de esas elecciones, las sucesivas tendrán efecto el primer martes después del primer lunes de noviembre, a contar desde el año 1920, y cada cuatro años después, y el término del cargo de todos los funcionarios municipales que hayan sido elegidos antes de ahora, y el cual de otro modo expira-

ría al principio del año 1919, se prorroga por la presente hasta que los funcionarios que se eligieren para cubrir dichos cargos en 1920 tomen posesión debidamente; . . . .

"Art. 35.—En las primeras elecciones que se celebren de acuerdo con esta Ley, los electores capacitados serán aquellos que tengan las condiciones de electores con arreglo a la ley actual. Después de esas elecciones los electores deberán ser ciudadanos de los Estados Unidos, que hayan cumplido veintiún años de edad, y tengan las demás condiciones que se prescribieren por la Asamblea Legislativa de Puerto Rico; *Disponiéndose,* que no se impondrá ni exigirá en ningún tiempo a ningún elector condición alguna que envuelva la posesión de propiedad.

"Art. 36.—Los electores capacitados de Puerto Rico elegirán en las próximas elecciones generales un Comisionado Residente en los Estados Unidos, por un término que comenzará en la fecha en que se le expida su certificado de elección, y continuará hasta el cuatro de marzo de 1921. En cada elección subsiguiente, a contar desde el año 1920, los electores capacitados de Puerto Rico elegirán un Comisionado Residente en los Estados Unidos por el término de cuatro años, que se contarán desde el cuatro de marzo siguiente a dichas elecciones generales, y quien tendrá derecho a reconocimiento oficial como tal Comisionado por todos los departamentos del Gobierno de los Estados Unidos, previa presentación, por conducto del Departamento de Estado, de un certificado de elección extendido por el Gobernador de Puerto Rico. . . . ."

En la vista de este caso hubo alguna discusión respecto a si el derecho a votar era un derecho natural o inherente de los ciudadanos de los Estados Unidos, y se hizo alguna mención de las decisiones en el caso de *Morales* v. *Junta Local de Inscripciones,* de abril 25, 1924, (pág. 79) donde se resolvió que éste no era un derecho inherente. Aquí, sin embargo, estamos considerando un alegado precepto constitucional. En algunos estados no existen disposiciones en la constitución acerca del derecho al sufragio. La cuestión de elección está grandemente en manos de la legislatura. En Puerto Rico, sin embargo, el derecho a votar por el Comisionado Residente, senadores y representantes se confiere a los electores capacitados de Puerto Rico por la Ley Orgánica. En mi opinión, por tanto, una ley que obstaculice se-

riamente el derecho de los electores capacitados de Puerto
a emitir sus votos, sería anticonstitucional.

Cuando una constitución guarda silencio sobre el parti-
cular, la legislatura de un Estado tiene absoluto control de
las elecciones y puede conceder o restringir el sufragio, se-
gún lo crea conveniente. En otras palabras, como se ha di-
cho, la legislatura entonces es la suprema expresión de la
voluntad del pueblo para conferir o restringir el voto más
o menos, según lo estime conveniente, limitada principal-
mente por la Constitución de los Estados Unidos. Puede
haber excepciones, pero ellas no afectan a la cuestión en este
caso. Por supuesto que podría entonces argüirse que la le-
gislatura podía pasar una ley electoral que regulara la elec-
ción de funcionarios que no sean los mencionados en la Ley
Orgánica. En ese caso si la Ley No. 2 era anticonstitucio-
nal con respecto a los funcionarios en particular nombrados,
probablemente no sería susceptible de división para conser-
var su constitucionalidad, considerada toda la naturaleza de
las leyes de elecciones.

Sin embargo, creo que puede inferirse de la Ley Orgá-
nica y especialmente de los artículos que he citado, que fué
la intención del Congreso conferir a los electores capacita-
dos de Puerto Rico el derecho a votar en todas las eleccio-
nes y para todos los cargos. La lectura de la Ley Orgánica
me lleva a esta conclusión y esta idea está robustecida por
las palabras con que concluye el artículo 35, que son que no
se impondrá ni exigirá en ningún tiempo a ningún elector
condición alguna que envuelva la posesión de propiedad.
Aunque la legislatura está autorizada para poner un límite
a los electores capacitados, por otra parte la intención reve-
lada por el Congreso es que los electores capacitados deben
tener el derecho a votar en las elecciones.

El propósito del Congreso fué hacer soberano al pueblo
por medio de sus electores capacitados. Esta corte, por
conducto del juez que suscribe, llamó la atención a este fin
en el caso de *Torres v. Asamblea Municipal de Guánica,* de

junio 19, 1924, (pág. 349). Allí dijimos lo siguiente: "A Puerto Rico se le ha dado lo mismo que a cualquier estado de la Unión una forma representativa de góbierno. Fundamentalmente el pueblo gobierna y elige sus representantes. Los representantes son elegidos por los electores capacitados." Que una legislatura puede regular pero no anular el derecho constitucional de los electores capacitados, ha sido resuelto repetidas veces y no me detendré en citar las decisiones.

### 3.

La verdadera cuestión principal en este caso es si la Ley No. 2 de 1924 obstaculiza el derecho de los electores capacitados de Puerto Rico a votar en las elecciones.

Se admite que había alrededor de 250,000 votantes en Puerto Rico en la última elección. La parte de la ley de junio 18, 1924, a la cual se ha hecho la mayor objeción es como sigue:

"Una petición para el nombramiento de un candidato para cualquier cargo que hubiere de votarse en un precinto, municipio, distrito, o en toda la Isla, deberá firmarse por peticionarios, igual en número al diez por ciento del voto total depositado para todos los candidatos para Comisionado a los Estados Unidos, en dicho precinto, municipio, distrito o Isla, en las elecciones precedentes respectivamente, y deberá haber por lo menos doscientos peticionarios en el caso de todos y cada uno de esos nombramientos."

De modo que para obtener el derecho a votar como partido para un Comisionado Residente, el partido político que hace la petición debe obtener 25,000 firmantes y proporcionalmente con respecto a los senadores, representantes y otros funcionarios. Este parece un número exorbitante. Los peticionarios mismos manifestaron estar satisfechos con la ley anterior por la cual deben obtener 200 firmantes en 20 municipalidades distintas, o, en otras palabras, por lo menos 4,000 firmas. Este era ya, en mi opinión, un número considerable. Si bien convengo en que no deben formarse in-

numerables pequeños partidos, me inclino a la vez al pare-
cer de que 4,000 firmas en Puerto Rico es un número consi-
derable, aunque si la legislatura en una ley regular de pri-
marias hubiera fijado un número algo mayor, tal vez una
corte no hubiera tenido nada que decir. Se insistió en
la vista, y esto ha sido observado en el alegato del de-
mandado, que exigir el 10 por ciento de los votantes de
Puerto Rico no era cosa irrazonable. El demandado su-
giere que hay un número de municipalidades en Puerto Rico,
21 por todas, donde el requisito de un 10 por ciento sería
menor de 200 votos y que en otras variaría de 200 en ade-
lante; que mil peticionarios sólo serían requeridos en las
ciudades mayores de la Isla y para senadores en ningún si-
tio tantos como 4,000. La teoría del Secretario Ejecutivo
fué aparentemente que no debe ser una injusticia exigir el
10 por ciento del voto total para formar un nuevo partido.
A mí me parece lo contrario, dado el principio y origen de
muchos partidos políticos. Dudo si alguno de los partidos
precursores del Partido Republicano en los Estados Unidos
jamás hubieran reunido en los varios estados el 10 por ciento
del voto total, y esto es así hoy en cuanto a otros partidos
cuyos candidatos han aparecido en papeletas oficiales en
tales Estados.

Prácticamente en todos los Estados Unidos y en Puerto
Rico las papeletas son secretas. Un nuevo partido o cual-
quier partido no puede reunir toda su fuerza en una peti-
ción o en las primarias. Se dudó algo en un caso si el exi-
gir que fuera emitido un voto del 30 por ciento de la fuerza
de un partido en unas primarias, no era una disposición le-
gal irrazonable. La prescripción fué sostenida por la corte
por ser una ley de primarias y no de elección. *State* v.
*Anderson*, 118 N. W. 22. En otras palabras, se reconoció
que sería muy difícil hacer que un partido en unas prima-
rias reúna tanto como un 30 por ciento de su fuerza total.
La cuestión es que un nuevo partido que puede obtener
25,000 votos probablemente, en un caso normal, tiene 50,000

o más electores. Puede admitirse que mediante gestiones activas los líderes de un partido pudieran mover un número mayor para firmar una petición que el que normalmente iría a las elecciones primarias. Sin embargo, un gran número de personas no tendrían deseo en firmar una petición para un nuevo partido aunque podrían votar secretamente por él. Los hombres rechazarían el confesar quizá en la primera elección que ellos habían abandonado sus filiaciones anteriores. Algunos pueden temer a sus jefes de partido y otros a sus asociados o principales. Puede presumirse que un partido que finalmente reunió 50,000 firmas en las urnas encontrara dificultad en obtener 25,000 firmas. El requisito de que para que un viejo partido tenga sitio en la papeleta electoral debe emitir un 20 por ciento del voto total en la elección anterior, se refiere a un hecho pasado. El viejo partido entonces no está en la obligación de hacer nada para la próxima elección. Cuando, sin embargo, un partido claramente nuevo se forma que podría tener derecho a esperar sacar adeptos de todos los partidos más viejos en las urnas, el requerir un 10 por ciento para su formación es generalmente negarle su existencia y ponerlo en una situación más crítica de la exigida a cualquier partido existente. En efecto, soy de opinión que exigir el 10 por ciento de firmantes para la formación de un nuevo partido en Puerto Rico es enteramente irrazonable.

En el caso de People of the State of New York ex rel. *Hotchkiss* v. *Smith et al.*, constituting a Board of Election of Putnam Country, etc., 206 N. Y. 231, la corte de apelaciones del Estado de New York resolvió que una disposición legal que requería más de 500 firmas para las nominaciones en distritos de asambleas u otras divisiones políticas del estado, mayores que un pueblo o barrio de una ciudad, era anticonstitucional. Era una cuestión de número. El demandado distingue este caso toda vez que el número total de votos requerido era excesivo para algunos distritos o municipalidades, pero sostiene que el voto del 10 por ciento no

.puede producir tales injusticias. El demandado mantiene que un tanto por ciento de votos es enteramente justo, trata` de demostrar que tipos altos de por ciento semejantes al que consideramos han sido sostenidos en varias cortes de los Estados Unidos. A este efecto se citan leyes de primarias. *McGrael et al.* v. *Phelps et al.,* 35 L.R.A. (N.S.) 353; *State* v. *Anderson,* 118 N.W., 22, 29, *supra.*

Una elección de primarias, por sí, no constituye guía. Una ley tal no es la Ley de Elecciones. La gran corriente de autoridades se pronuncia en el sentido de que para impedir el fraude y producir la fuerza del partido la legislatura puede exigir que el diez, veinte o treinta por ciento de los votantes de un partido aparezca el día de la elección primaria. Una de las razones para el número alto es 'estar seguro de que los candidatos son verdadera expresión del partido y que la selección primaria no es el resultado parcial obtenido por los votos de un partido contrario. Hay una hábil discusión en el caso de *Ledgerwood* v. *Pitts,* 125 S.W. 1036. Las cortes han expresado que la Legislatura, dentro de límites razonables, puede regular las leyes de primarias y por tanto el número de personas que pueda requerirse para votar en tales primarias. Sin embargo, no puedo ver la analogía que existe entre estas leyes de elección primaria y el número de votos requerido para formar un nuevo partido. Una ley de elección de primarias es sin duda o generalmente para la manifestación de partidos ya formados y algunas de estas leyes de primarias también prescriben la manera en que los nuevos partidos pueden tener un sitio en un ticket impreso. Existen por supuesto disposiciones como aquí de que para que un partido pueda tener derecho a un sitio regular en la papeleta electoral dicho partido debe haber depositado el diez, quince o veinte por ciento, según sea el caso, de la totalidad de los votos en la última elección para algún cargo particular. No puede indicarse demasiado enfáticamente que el exigir que un determinado promedio de un partido anteriormente organizado esté pre-

sente en las urnas, nunca es otra cosa que una expresión de
la fuerza del partido y por tanto siempre una posibilidad.
Los líderes de partido con estos por cientos de todos sus
miembros en un caso de emergencia pueden hallar las per-
sonas que van a las urnas.

En el caso de *State* v. *Blaisdell* (N.D.) 127 N.W. 720, la
corte se expresa así:

"Predomina gran error y mala inteligencia acerca de la ley de
elección primaria. El infrascrito ha oido decir muchas veces que
los votantes deben tener el privilegio de votar para miembros de
cualquier partido o para miembros de ningún partido en las prima-
rias y que un voto depositado para los demócratas por los republi-
canos debe contarse a favor de la nominación de candidatos para el
partido demócrata. Todas estas ideas están fuera del caso. La ley
de primarias no tiene por objeto y no prescribe sobre nominaciones
que no son del partido. Su único fin es prescribir y regular la no-
minación de candidatos por partidos políticos. Aquellos que no per-
tenecen a ningún partido o a partidos que no depositan el por ciento
de votos necesario para quedar comprendidos en los términos de la
ley de elección primaria, como partes, pueden proceder en otra forma
como lo dispone el estatuto y sus derechos a llegar a ser candidatos
o hacer nominaciones dentro de sus respectivos partidos o círculos
políticos no han sido infringidos."

Es evidente que en North Dakota como en otros sitios la
ley de primarias es para la reglamentación de partidos que
alcanzan a cierto número en las elecciones anteriores y no
se refiere a partidos que están precisamente formándose.
El fiscal general cita a North Dakota como uno de los luga-
res donde el requisito de un diez por ciento para nuevos
candidatos es favorecido. Según yo creo, el estatuto de ese
Estado aplicaba el diez por ciento a favor de comunidades
cuya totalidad no podía llegar a 300, pero limitaba el nú-
mero en cualquier caso a 300 firmas. El fiscal general tam-
bién citó un caso de Nevada, el de *State* v. *Harmon*, 127
Pac. 221. La población total de Nevada en el año 1920 era
77,407. La fuerza de votantes varones era por tanto alre-
dedor de 15,000 votos. El voto total en el Estado por peti-

ción al diez por ciento hubiera por tanto requerido solamente 1,500 firmas. La probabilidad es que un requisito del diez por ciento en Nevada era necesario para obtener un número razonable de firmas en cada condado del Estado. No había envuelta ninguna cuestión constitucional en el caso de Harmon ni en el de *State* v. *Brodigan,* 126 Pac. 680, también de Nevada.

*Steward* v. *Cartwright,* 118 S.E. fué un caso en el cual se exigía a un candidato individual para alcalde de la ciudad de Savannah, Georgia, obtener una tercera parte de los votantes inscritos. Parece que la obtuvo y fué su opositor quien recurrió a un auto de *mandamus.* La validez del requisito de la tercera parte no estaba envuelta. No se extendía a todo el Estado sino que se limitaba, al parecer, a la ciudad en particular. La cuestión principal es que el requisito no afectaba a la vida de un partido en absoluto sino únicamente a una persona que pretendía ser nominada independientemente de un partido. Para que una persona aparezca en una papeleta electoral independientemente de cualquier partido el voto de un tercio era necesario. La corte sostuvo el derecho a emitir el voto independiente.

Los peticionarios también citaron una ley de elección primaria de California que fué declarada anticonstitucional, pero fuera de California las leyes primarias generalmente han sido sostenidas como justas, pues a falta de un precepto constitucional las leyes de elección han sido sostenidas.

De lo dicho anteriormente, si tengo razón al sostener que el requisito de un diez por ciento es irrazonable, se seguiría entonces que tal disposición priva a una parte considerable del electorado de su derecho a votar y por tanto que es inconstitucional y nula.

### 4.

Examinando la ley de elecciones para Puerto Rico es evidente, en vista de los artículos 36, 31, 42 y 63 que la idea o fin nominal de las elecciones en Puerto Rico es uno de

partido. En toda la ley no existe ningún precepto para vo-
tar por alguien que no sea ya un candidato de un partido
político. En casi todos los Estados y de acuerdo con casi
todas las leyes de votación australianas que existen en los
Estados se prescribe en cuanto a la forma para depositar
votos independientes o para candidatos que no están nom-
brados en la papeleta impresa u oficial. Se sugiere firme-
mente en numerosas decisiones que la ley de votación aus-
traliana en los respectivos Estados sería nula e ineficaz a
no ser que hiciera tal disposición, o a menos que el votante
tuviera derecho a votar por quien él desee, haciendo una in-
dicación en la papeleta final o borrando algún nombre y po-
niendo otro en su lugar.

Hablando del derecho de todo individuo a votar según
crea conveniente, se dice en el tomo 9 de Ruling Case Law,
pág. 1054, que la omisión en conferir este derecho era una
seria obstaculización del libre ejercicio de la franquicia elec-
toral; que si bien la Legislatura podría limitar el número
de nombres impresos en la papeleta oficial el votante debe
estar libre para votar por los candidatos de su propio gusto.
En el caso de *Cole* v. *Tucker,* 164 Mass. 488, la corte llamó
la atención de que las llamadas leyes de votación australia-
nas en las varias formas que han sido establecidas en mu-
chos de los Estados han sido sostenidas con tal que las le-
yes permitan al votante votar por aquellas personas que él
elija. El caso de *Stewart* v. *Cartwright,* 118 S.E. 861, ci-
tado por el Attorney General, demuestra el amplio alcance
del mismo precepto. Véase también a 91 A.S.R. 862; 20
Corpus Juris, pág. 840 y siguientes. Véase también espe-
cialmente el caso *In re City Clerk of Paterson,* 88 Atl.
694, 695.

La ley de Puerto Rico parece hacer imposible o a lo me-
nos impracticable para cualquier votante hacer una selec-
ción independiente en la elección. En otras palabras, en
Puerto Rico la regla es que un votante debe depositar su
papeleta para los candidatos ya nombrados, y sometidos a

la junta de elecciones por el secretario ejecutivo. No pretenderé ahora discutir el efecto de tal omisión en Puerto Rico. Estoy dando por sentado que la legislatura tenía el derecho de establecer un sistema de partidos para Puerto Rico. Asumiendo esta facultad en la Legislatura de Puerto Rico y encontrando que el único medio por el cual todos los electores capacitados de Puerto Rico pueden depositar sus votos como prescriben las varias secciones de la Ley Orgánica es votando por uno de los partidos políticos ya reconocidos u organizados o, de no ser así, obteniendo un derecho de petición, resultaría que cualquier ley que hiciera gravoso para un número considerable de electores emitir sus votos sería anticonstitucional. Debe hacerse énfasis en el hecho de que en Puerto Rico por la Ley Orgánica todo elector capacitado tiene el derecho de votar. No puede obligársele a votar por un partido al cual no esté afiliado. La Ley de Elección debe ser una expresión liberal que cumpla con la intención del Congreso de que todo elector capacitado pueda votar, y cualquier ley que indebidamente restrinja este derecho es anticonstitucional y nula, como sostengo que lo es la Ley No. 2 de la Sesión Extraordinaria del año 1924, o a lo menos en parte.

5.

[2] Contestando a la orden para mostrar causa, el secretario ejecutivo, por conducto del fiscal general, opuso que la petición de *mandamus* no mostraba ningún requerimiento hecho a dicho secretario ejecutivo y que no había nada en la petición que indicara que el secretario ejecutivo dejaría de cumplir con el objeto de la petición. Los peticionarios entonces obtuvieron permiso para enmendar su petición al efecto de expresar que estaban informados y creían que el secretario de Puerto Rico cumpliría con la ley como fué aprobada por la Legislatura y ésta es la presunción. Casi podría convertirse en una presunción legal el hecho de que el secretario ejecutivo, a falta de una decisión de la corte o

de alguna fuerte indicación por parte del fiscal general observaría o trataría de observar la ley como fué decretada por la legislatura.   El caso de *People ex rel. Hotchkiss* v. *Smith,* 206 N.Y. 231, *supra,* parece mostrar que en un caso como éste, tal indicación de la falta de cumplimiento por parte del demandado es innecesaria, y algo como esto parece inferirse de dicha opinión.   El fiscal general, sin embargo, llamó la atención hacia el hecho de que cuando fué presentado el caso de Hotchkiss en las cortes inferiores existían indicaciones de que la elección de funcionarios cumpliría con la ley existente subsiguientemente declarada anticonstitucional.   Soy firmemente de opinión de que los peticionarios en un caso como el presente donde una legislatura había precisamente decretado y aprobado una ley, tienen el derecho a presumir que el secretario cumplirá con ella.   No sólo es esto cierto sino que el fiscal general está aquí en representación del secretario ejecutivo sosteniendo la constitucionalidad de esta ley.   Supongo que todos estamos deseosos de que se resuelva la cuestión y el único efecto al insistir en este punto, si estoy equivocado, sería que los peticionarios tendrían que presentar otra petición después de haber archivado finalmente sus papeles electorales.

En cuanto a un requerimiento previo, en un asunto de gran interés público como éste las decisiones indican que tal requerimiento es innecesario.   Los casos citados por el fiscal general en contrario no fueron realmente cuestiones de interés público, ni siquiera el caso de *Negrón* v. *El Superintendente de Elecciones,* 11 D.P.R., 366.

Por las siguientes autoridades se ha resuelto que existe una distinción entre los deberes de carácter público y los deberes de naturaleza particular que afectan solamente a los derechos de individuos.   En tales casos la misma ley substituye al requerimiento y la omisión en cumplir el deber requerido es equivalente a una negativa.   *Torres* v. *Asamblea Municipal de Guánica,* de junio 13, 1924 (pág. 349); *State ex rel. Morris* v. *Wrightson,* 22 L.R.A. 548,

561; *People ex rel. O'Brien* v. *Cruger,* 12 App. Div. 536; Matter of Hopper, 73 Misc. Rep. 369, 376.

En el caso de Torres sugerimos que la expedición de una orden para mostrar causa o el auto alternativo era suficiente aviso.

### 6.

[3] También se afirma que la petición es informal al no exponer los preceptos en particular de la Constitución que se supone han sido infringidos. Los peticionarios sí alega-ron que la ley No. 2 infringía la Ley Orgánica, y donde exis-ten tantas secciones de la misma que confieren al elector capacitado el derecho a votar por varios funcionarios, pa-rece innecesaria mayor especificación. En la vista ante mí se hizo mención de las secciones 35 y 36. El secretario eje-cutivo sabrá por esta opinión cuáles son las secciones cita-das y si el asunto es de alguna importancia se concederá a los peticionarios permiso para enmendar.

### 7.

[4] Otra forma de objeción fué que nada ha sido pre-sentado al secretario ejecutivo que requiera su actuación. Me basta para contestar a esto como lo hizo la Corte de Apelaciones de New York en el caso de *Hotchkiss* v. *Smith,* 206 N.Y., 231, supra:

"En este caso una negativa a conocer del procedimiento podría y probablemente resultaría en que la resolución de la corte no ten-dría ningún fin práctico. Resulta que la organización representada por los peticionarios no ha existido lo suficiente para que pueda te-ner una posición fija como organización de partido dentro de los términos del estatuto. La organización pretende hacer nominacio-nes independientes y uno de los demandados ha expresado que la junta de elección cumplirá con los términos de las enmiendas a la ley electoral hechas en 1911. Si este procedimiento no se sigue puede resultar en impedir que se hagan tales nominaciones independientes. La situación es excepcional y extraordinaria. El procedimiento debe seguirse aunque no se pretenda que sea un precedente en casos en-

tre individuos como tales o en cualquier caso excepto cuando los hechos y circunstancias son igualmente excepcionales y extraordinarios. (Véase la resolución de esta Corte In the Matter of Hopper v. Britt, 203 N. Y. 144 Matter of Hopper v. Britt, 204 N. Y. 524, y también de la Corte en el caso de State ex rel. Morris v. Wrightson, 56 N. J. L. 126.)''

## 8.

El secretario ejecutivo también llamó la atención al hecho de que los peticionarios habían procedido de acuerdo con la nueva ley con respecto a la ciudad de Moca. Sin embargo, el tratar de cumplirla no coarta el derecho de los peticionarios. Puede ser que no obtengan las firmas deseadas en otra parte. Es una cuestión de un derecho de los peticionarios a proceder independientemente de la ley de 1924.

Como sucede casi invariablemente en casos de elecciones, el tiempo que tiene un juez para hacer un análisis y desarrollo del asunto es corto. Como lo es, la opinión demuestra la premura con la cual ha sido preparada pero estoy seguro razonablemente, sin embargo, de que una ley electoral que se niega en una comunidad tan poblada como es Puerto Rico a reconocer a un partido a no ser que pueda presentar por petición el diez por ciento del electorado en la elección anterior, niega el derecho al sufragio a un número considerable de electores capacitados y es anticonstitucional y nula. Si otras partes de la ley son también nulas es cosa que dejo para ulterior discusión.

Aun cuando estuviera convencido de que tenía la facultad para expedir un auto perentorio, resultaría, después de sostener que la ley era al menos en parte anticonstitucional, que al secretario ejecutivo debe darse la oportunidad de cumplir con este criterio. No estando convencido de mi autoridad para librar un auto perentorio, *se expedirá un auto alternativo* requiriendo al secretario ejecutivo que haga caso omiso de toda aquella parte que en la ley de junio 18 de

1924 requiera la certificación del diez por ciento de los votantes en la elección anterior, debiendo proceder de acuerdo con las leyes anteriores.