RAFAEL MARTÍNEZ NADAL, peticionario, *v.* EDUARDO J. SALDAÑA, SECRETARIO EJECUTIVO, demandado.

No. 256.—*Visto:* Abril 30, 1928. *Resuelto:* Junio 25, 1928.

*R. Martínez Nadal, Adolfo Dones* y *Armando A. Miranda,* abogados del peticionario; *J. A. López Acosta, Procurador General Interino* y *R. A. Gómez, Sub-Procurador,* abogados del demandado; *José Tous Soto,* abogado del Partido Republicano Puertorriqueño, interventor.

EL JUEZ ASOCIADO SEÑOR WOLF, emitió la opinión del tribunal.

Rafael Martínez Nadal, en representación del partido legalmente conocido con el nombre de "Partido Constitucional Histórico," ha presentado una petición de *mandamus,* la que, según ha sido enmendada, puede decirse que tiene un triple aspecto, aunque desde luego, en la petición misma se solicita que se hagan ciertas inscripciones. En primer lugar, aceptando la ley tal como rige actualmente, dicho partido alega haber llevado a las urnas en las últimas elecciones más del 20 por ciento de los votos emitidos en San Juan, y que, por tanto, de acuerdo con la sección 36 de la Ley Electoral, dicho partido tiene derecho a nombrar candidatos para ese distrito por medio de convenciones debidamente convocadas, habiéndose celebrado en efecto una convención. El segundo aspecto de la petición es obtener el cambio de nombre del partido. El tercer aspecto, que es el más importante, es que la sección 36 de la Ley Electoral sea declarada inconstitucional, en efecto porque al disponer que para que un partido pueda tener derecho a nombrar candidatos mediante convención, debe haber obtenido el 20 por ciento del total de votos depositados en las últimas elecciones, la Legislatura ha excedido el límite de una reglamentación razonable de la franquicia electoral.

Para los fines generales de esta opinión debe agregarse que durante las últimas elecciones se depositaron 253,520 votos, de los cuales 132,755 fueron depositados por el partido

Unionista, 30,286 por el partido Republicano, 56,103 por el Socialista y 34,576 por el Constitucional Histórico, que es el partido interesado en esta petición. También hubo otros votos aislados.

Resolveremos primeramente los aspectos de menor importancia. La sección 36 de la Ley Electoral, según fué enmendada el 30 de junio de 1923, dispone:

"Cualquier partido político que hubiere depositado más del veinte (20) por ciento del voto total de la Isla para Comisionado a Washington en las precedentes elecciones generales, tendrá derecho a nombrar candidatos por medio de convenciones, debidamente convocadas."

La mera lectura de esta sección nos lleva al convencimiento de que la intención de la Legislatura fué hacer que la disposición relativa al 20 por ciento fuese aplicable al voto total depositado por un partido en la isla, y no al total de votos depositados en determinados distritos. La Legislatura trataba de definir lo que debía constituir un partido político.

Entramos a discutir la cuestión del nombre. En 1924, el antiguo Partido Republicano se dividió en dos sectores. Uno de ellos retuvo la maquinaria del partido, y continuó designándose con el nombre de Partido Republicano. El otro sector celebró una convención separada y llegó a ser conocido con el nombre de "Partido Constitucional Histórico," que es el verdadero peticionario en este caso. El partido desea cambiar su nombre por el de "Partido Republicano Puro." El demandado, en su carácter de Secretario Ejecutivo de Puerto Rico, al igual que el interventor, el Partido Republicano Puertorriqueño, alegan que dicho Partido Republicano conserva aún el nombre y el emblema del partido. El peticionario alega que el Partido Republicano tiene convenida una fusión con el Partido Unionista, y que, por tanto, dicho Partido Republicano ha perdido su personalidad. Este, sin embargo, sostiene y demuestra que esta fusión no tendrá efecto legal hasta el día en que se celebren las elecciones. La

sección 42 de la Ley Electoral, según quedó enmendada el 7 de mayo de 1927, lee así:

"Ningún partido político adoptará como nombre o emblema un nombre o emblema que se hubiere usado o adoptado previamente por otro partido político, en todo o en parte, si ese otro partido todavía reclama y usa dicho nombre o emblema. . . . ."

Estamos convencidos de que la Legislatura tenía derecho a prohibir el uso de un nombre que otro partido utiliza parcial o totalmente y que tal prohibición se hará extensiva a un nombre que el otro partido se proponga usar en las elecciones venideras. No importa que el día de las elecciones o posteriormente el otro partido se proponga hacer una fusión con un tercer partido bajo un nombre distinto. El llamado Partido Republicano tiene una existencia legal independiente hasta el mismo día de las elecciones.

Podríamos decir incidentalmente que esto resuelve el derecho del partido legalmente reconocido como Partido Republicano Puertorriqueño a intervenir en este procedimiento, según lo permitió el tribunal. Tal vez el interventor en su alegato ha discutido otras cuestiones, pero resolvemos que ello es inofensivo, especialmente en vista de que el peticionario no ha hecho objeción alguna a que el interventor comparezca como *amicus curiae*. La intervención no afectaba otros derechos que los correspondientes al partido mencionado.

El peticionario también alega que el candidato de su partido para comisionado residente obtuvo más de 90,000 votos en las últimas elecciones. Resulta este número de votos porque el partido representado por el peticionario y el partido Socialista unieron sus fuerzas y postularon el mismo candidato. Quizá si las palabras de la ley electoral fuesen tomadas literalmente procedería tal interpretación, pero necesariamente la intención del legislador fué distinta.

 ██ Antes de entrar a discutir la verdadera cuestión constitucional que tenemos ante nuestra consideración, sería

conveniente hacer una ligera reseña de la historia de los partidos políticos de los Estados Unidos. Parece que hasta el año 1832 eran desconocidas las convenciones políticas según se usaron posteriormente como medio de nombrar candidatos y redactar plataformas. Más o menos en esa época y con posterioridad a la misma gradualmente comenzaron a usarse las convenciones, pero las papeletas electorales oficiales eran desconocidas por completo. Este estado de cosas, continuó, con pocas excepciones, por más de sesenta años. Un bosquejo tomado del Estado de Wisconsin demostrará las condiciones que prevalecían generalmente en los Estados Unidos. "Había una gran variedad de papeletas electorales —no se exigía determinada calidad o color de papel—podían ser manuscritas o impresas o parcialmente manuscritas y parcialmente impresas, podía pegarse papel (*stickers*) y prácticamente no había restricción alguna sobre la libertad de acción del elector individual en lo referente a la forma de depositar su papeleta en la urna." *State Ex Rel Barber* v. *Circuit Court,* 178 Wis. 468, 473. Frecuentemente se usaban papeletas conteniendo candidaturas íntegras preparadas por los organismos políticos. A fines del siglo, el sistema electoral australiano fué introducido, y bien pronto llegó a ser prácticamente universal. Es el sistema usado en Puerto Rico. Para la celebración de las elecciones, la Legislatura dispone que haya una papeleta oficial, cuya votación será secreta, y prescribe además toda la maquinaria electoral. La papeleta oficial, los partidos políticos o las personas con derecho a estar representadas en las mismas, y cuándo son el objeto principal de la cuestión constitucional envuelta en este caso.

Más o menos en época contemporánea a la del sistema electoral australiano, el sistema de elecciones primarias o de preferencia fué introducido en los Estados Unidos. En éste se disponía la selección de ciertos candidatos en una elección celebrada varios meses antes de la elección general. Hasta

cierto punto, esta elección primaria substituía las convenciones políticas, y así se le consideraba. Teóricamente, a esas primarias sólo asistían los afiliados de un partido político. El objeto nominal de tales elecciones era quitar en lo posible el nombramiento de los candidatos de un partido, de las manos de los jefes políticos y ponerlos directamente en manos del pueblo. Podría decirse que una elección primaria era generalmente propuesta para los partidos más importantes, o sea, para las organizaciones que hubieran depositado en las urnas un tanto por ciento crecido del voto total emitido en el estado en las elecciones anteriores. A los partidos que no habían depositado ese voto crecido, frecuentemente se les reservaba el derecho de reunirse en convenciones, siempre que tales partidos hubiesen obtenido un tanto por ciento menor del voto total. También los partidos aún más pequeños conservaron generalmente el derecho de figurar en la papeleta oficial mediante petición, bajo ciertas condiciones. Generalmente, también se incluía una columna en la papeleta para votar independientemente de cualquier afiliación política. En un estado, el de Minnesota, donde se establecieron las primarias, el derecho a nombrar candidatos mediante convención fué abolido; pero bajo disposiciones muy liberales se conservó el derecho de figurar en la papeleta oficial mediante petición. Puede que haya habido otros estados que también hayan suprimido las convenciones. El extremo que debe notarse es que el derecho de celebrar convenciones fué cuidadosamente conservado, hasta que, o a menos que, un sistema adecuado de elecciones primarias se introdujera en los distintos estados. Nunca se ha adoptado el sistema de elecciones primarias en Puerto Rico.

Por tanto, los casos relativos a las condiciones de las cuales una legislatura ha hecho que dependa el derecho a las elecciones primarias, deben ser examinados con cautela. El derecho a figurar en la papeleta oficial puede o no depender de las elecciones primarias. Puede haber formas indepen-

dientes de figurar en la papeleta oficial. Algunas de las leyes aprobadas por las legislaturas se refieren al derecho de celebrar elecciones primarias. Otras algo distintas hacen que el derecho a figurar en la papeleta oficial dependa del resultado de las elecciones primarias, a la celebración de las cuales el partido ya tenía derecho.

Cuando en los libros se mencionan por cientos tan altos como el 30, se refieren a cálculos basados en la fuerza del partido. En las primarias, con el fin de adquirir el derecho de figurar en la papeleta oficial, el partido debe en ciertos estados tener determinado tanto por ciento no del voto total, sino del número de votos depositados por ese partido, digamos, por ejemplo, para el cargo de gobernador en las elecciones anteriores. En otros estados las primarias deben expresar la verdadera voluntad de un número considerable de los miembros del partido. El tanto por ciento así escogido no tiene relación legal alguna en estos casos con el voto total depositado en el estado, sino que solamente determina la fuerza de un partido. En 1924 el juez que escribe esta opinión expidió un auto alternativo de *mandamus,* acompañado de una opinión, en relación con la constitucionalidad de una sección diferente de la Ley Electoral. *Martínez Nadal* v. *Saldaña,* 33 D.P.R. 721. En ese caso, este juez se expresó así:

"Una elección de primarias, por sí, no constituye guía. Una ley tal no es la Ley de Elecciones. La gran corriente de autoridades se pronuncia en el sentido de que para impedir el fraude y producir la fuerza del partido la legislatura puede exigir que el diez, veinte o treinta por ciento de los votantes de un partido aparezca el día de la elección primaria. Una de las razones para el número alto es estar seguro de que los candidatos son verdadera expresión del partido y que la selección primaria no es el resultado parcial obtenido por los votos de un partido contrario. Hay una hábil discusión en el caso de *Ledgerwood* v. *Pitts,* 125 S. W. 1036. . . . . No puede indicarse demasiado enfáticamente que el exigir que un determinado promedio de un partido anteriormente organizado esté presente en las urnas, nunca es otra cosa que una expresión de la

fuerza del partido y por tanto siempre una posibilidad. Los líderes del partido con estos por cientos de todos sus miembros en un caso de emergencia pueden hallar las personas que van a las urnas.''

El sistema electoral australiano y el de elecciones primarias recibieron varios ataques, pero después de algún tiempo cada método o sistema fué aceptado casi uniformemente, y allá por el 1910 la jurisprudencia quedó fija (*static*). Gran parte de la historia y jurisprudencia sobre la materia puede hallarse en el caso de *State ex rel McGrael* v. *Phelps,* 144 Wis. 1, 35 L.R.A. (N. S.) 353, que puede decirse ha llegado a ser el caso principal y será mencionado varias otras veces en el curso de esta opinión.

Llegamos entonces a la cuestión esencial, o sea, si para que un partido tenga derecho a nombrar candidatos mediante convención el requisito impuesto por la Legislatura del 20 por ciento del voto total depositado para Comisionado Residente en las elecciones procedentes, es constitucional.

El poder gubernamental supremo puede reglamentar o disponer la celebración de elecciones en la forma que le plazca. Hasta que una constitución o un estatuto lo confiera, no existe el derecho natural al voto. Luego, ese derecho es un mero privilegio. La Legislatura de cualquier estado, sujeta tal vez a la Constitución de los Estados Unidos, puede hacer lo que le plazca. Cuando se redacta una constitución concediendo el derecho a ejercer la franquicia electoral, el derecho de la Legislatura queda claramente limitado por esa constitución. *Minor* v. *Happersett,* 21 Wall. 162; *Gougar* v. *Timberlake,* 148 Ind. 41, 62 A.S.R. 49, 37 L.R.A. 648, 46 N. E. 339; *State ex rel McGrael* v. *Phelps, supra; State ex rel Barber* v. *Circuit Court,* 178 Wis. 468, y casos allí citados; *People ex rel Hotchkiss* v. *Smith,* 206 N. Y. 231, 242; *State* v. *Superior Court for King County,* 60 Wash. 370, 111 Pac. 233, 140 A.S.R. 925; *Attorney General* v. *Common Council,* 78 Mich. 545, 18 A.S.R. 458, y nota; *Katz* v. *Fitzgerald,* 93 Pac. 112; *State ex rel Plimmer* v. *Poston,* 58 Ohio 620, 51 N.

E. 150, 42 L.R.A. 238, con especial referencia a la opinión disidente; *Independence Party Nomination,* 57 Atl. 344; *State ex rel Binner* v. *Buer,* 174 Wis. 120; 20 C. J. 104 *et seq.,* párrafos 90, 91 y 92; 9 R.C.L. 982 *et seq.,* notas 10 y 11; 9 R.C.L. 1046 *et seq.,* párrafos 63 y 64.

En los textos se hallan innumerables casos que han sostenido el derecho de la Legislatura de reglamentar el sistema electoral australiano, el de primarias y el tanto por ciento de votantes en uno u otro sistema que dé derecho a figurar en las primarias o en la papeleta oficial misma. En todas las opiniones está implícito, y con frecuencia más o menos directamente expresado, que es una cuestión que incumbe al poder judicial determinar si la Legislatura se ha excedido o no en el ejercicio de una reglamentación razonable de las elecciones. *State ex rel McGrael* v. *Phelps, supra,* y otros casos. Mucho tiempo ha, el Juez Presidente Sr. Shaw, como portavoz de la corte, en el caso de *Capen* v. *Foster,* 12 Pick. 485, 23 A. D. 632, dijo que la Legislatura podía reglamentar dentro de límites constitucionales, pero que esa facultad no autorizaba el ejercicio de la autoridad legislativa en forma tal que, so pretexto y color de reglamentar, se destruyera o restringiera indebidamente el derecho mismo. Con frecuencia pueden hallarse manifestaciones en el sentido de que si bien la Legislatura puede reglamentar, no puede entorpecer u obstruir seriamente la franquicia electoral. Una vez establecido—dicen las cortes,—el derecho al voto es tan sagrado como cualquier otro derecho.

El 14 de mayo de 1928 la Corte Suprema de los Estados Unidos dijo que la relación existente entre la Carta Orgánica de las Islas Filipinas y sus asuntos gubernamentales era similar a la relación existente entre la constitución de un estado y el estado. *Springer et al.* v. *Governor of the Philippine Islands.* La Carta Orgánica de Puerto Rico estableció la franquicia electoral para Puerto Rico. Secciones 26, 27,

28, 29, 35 y 36. Estas secciones han sido copiadas íntegramente en el caso de *Martínez Nadal* v. *Saldaña,* 33 D.P.R. 721. Examinando esas secciones, no hay duda alguna de que las personas legalmente calificadas para votar en Puerto Rico tienen derecho a ejercer la franquicia electoral. Según la sección 35, la Legislatura puede, bajo ciertos límites, aumentar los requisitos, pero no puede privar o entorpecer u obstruir seriamente la franquicia electoral, una vez que ha sido otorgada definitivamente.

La sección 36 de la Ley Electoral enmendada dispone:

"Cualquier partido político que hubiere depositado más del veinte (20) por ciento del voto total de la Isla para Comisionado a Washington en las precedentes elecciones generales, tendrá derecho a nombrar candidatos por medio de convenciones debidamente convocadas."

Una disposición congruente con la anterior puede hallarse en la sección 14 enmendada, que lee así:

"Por partidos principales se significa los dos partidos políticos cuyos candidatos para Comisionado a los Estados Unidos obtuvieron el mayor número de votos, en primero y segundo término, depositados para candidatos para aquel cargo en las precedentes elecciones; por partido de la mayoría se significa el partido político cuyo candidato para Comisionado a los Estados Unidos obtuvo el mayor número de votos para candidato para dicho cargo en las elecciones precedentes; por partido organizado se significa un partido político cuyo candidato para Comisionado a los Estados Unidos obtuvo un veinte por ciento o más de la totalidad de votos para todos los candidatos para aquel cargo en las elecciones precedentes; y cualquier partido político que haya adquirido la categoría de partido principal, partido de la mayoría o partido organizado, será considerado y tratado como tal hasta que un candidato de dicho partido para Comisionado a los Estados Unidos dejare de obtener en unas elecciones subsiguientes, el número de votos necesarios para alcanzar dicha categoría de acuerdo con las reglas anteriormente expuestas en esta Sección."

Creemos que estas secciones, y especialmente la 36, necesariamente entorpecerán el derecho de los votantes en Puerto

Rico. En el caso de *State ex rel McGrael* v. *Phelps, supra,* el Juez Asociado Sr. Marshall, hablando a veces quizá por sí mismo, demóstró que había una zona neutral en la cual era peligroso que la Legislatura entrara. Dada la aceptación que el caso ha recibido, puede ser considerado como ley establecida. La corte declaró que dentro de esa zona neutral el tribunal debía seguir a la Legislatura, como lo hizo la corte de Wisconsin por el voto de la mayoría. Dos de los siete jueces disintieron. Los hechos sobre los cuales el Juez Marshall evidentemente vaciló fueron los siguientes: La ley de 1909 disponía que si el número total de votos depositados en las elecciones primarias para todos los candidatos "que eran postulados para determinado cargo en la papeleta de cualquier partido" era el 20 por ciento o más" del número "depositado para los candidatos de tal partido para gobernador durante la última elección general," el candidato que recibiera el mayor número de votos "podía hacer figurar su nombre en la papeleta oficial en las próximas elecciones," como candidato de ese partido para tal puesto, etc. La diferencia existente entre los jueces era si el requisito del 20 por ciento del voto total anterior del partido, aun en las elecciones primarias, no era excesivo. La experiencia ha demostrado que si bien las personas van a votar a las elecciones generales en número suficiente, es difícil lograr que acudan a las primarias. ¿Debe un partido estar para siempre obligado a reunir sus huestes, especialmente en momentos de poca importancia o cuando la nominación de determinado candidato es un hecho de antemano? Preguntas de esta naturaleza han estado en las mentes de varios jueces.

Para tener una idea de lo que este requisito significaría, reproduciremos algunas cifras para Puerto Rico. Si la ley de Wisconsin hubiese prevalecido aquí, el Partido Unionista, que depositó 132,755 votos durante las últimas elecciones, tendría que producir 26,551 en las primarias, o sea, poco

más del 10 por ciento del total de 253,520 de votos deposita-dos. El partido Socialista tendría que producir alrededor del 4 por ciento del voto total, y el Partido Republicano y el del peticionario, menos del 3 por ciento cada uno. La ley de Wisconsin y las de otros estados que exigen un tanto por ciento alto en las primarias, serían claramente favorables a los partidos de la minoría, si el cálculo se hace tomando como base el número total de votos depositados en el estado. Si el cálculo se hace en relación con el número total de votos emitidos, el sistema de primarias es más fuerte para los partidos mayores que para los menores, pero al partido de la mayoría siempre debe serle posible reunir sus huestes, teniendo un estímulo para hacerlo así.

En el caso de Wisconsin el Juez Marshall demuestra que disposiciones similares han sido sostenidas por las cortes, y citó casos en que determinado tanto por ciento del voto total depositado había sido requerido en las primarias para poder figurar en la papeleta oficial. Mencionó tres casos que aparentemente requerían el 10 por ciento. Hemos examinado dos de ellos, y sólo exigían el 3 por ciento. El tercero era el caso de Minnesota titulado *State ex rel Fitz* v. *Jensen,* 86 Minn. 19, 89 N. W. 1126. Allí se exigía el 10 por ciento, se abolían las convenciones, pero se hacían disposiciones liberales para que los partidos tuvieran derecho a figurar en la papeleta oficial. En el caso de Minnesota, la corte dijo que algunos de los jueces creían que el tanto por ciento era crecido, pero evidentemente la corte resolvió que la fijación de este tanto por ciento no dejaba de ser un privilegio legislativo. El caso de *Schafer* v. *Whipple* (Col.) 55 Pac. 180, es uno de los que hemos hallado que demuestran que el estado exigía un tanto por ciento ascendente al 10 por ciento para que un partido pudiera nombrar candidatos por convención, y se demostró que una ley similar había sido aprobada en el estado de Louisiana. *Labauve* v. *Michel,* 121 La. 374, 46 So. 430. En el caso de Colorado, un tanto por ciento menor del electorado

puede obtener representación en la papeleta oficial mediante
petición. No se levantó cuestión de constitucionalidad alguna
respecto al derecho de fijar el 10 por ciento. No nos hemos
detenido a examinar las condiciones existentes en Louisiana,
pero allí se trataba únicamente de regular las primarias y
no la papeleta oficial.

Desde luego que es físicamente imposible, dentro del
tiempo de que disponemos, revisar todas las disposiciones
estatutorias aplicables a determinada jurisdicción, y mucho
menos la jurisprudencia que abarca una cuestión tan general.
Baste decir que el estudio que hemos hecho nos lleva al con-
vencimiento de que cuando se limita el derecho de celebrar
convenciones o aun de valerse de las primarias, el tanto por
ciento raras veces excede del 5 por ciento del voto total de-
positado, y generalmente es tan bajo como el 1, el 2 o el
3 por ciento. Podría decirse que el requisito del 10 por ciento
es el límite de la zona neutral a que el Juez Marshall se
refería, y que las legislaturas generalmente habían fijado un
tanto por ciento mucho menor y dentro de límites estricta-
mente razonables.

El Procurador General interino ha citado varios casos
que han quedado cubiertos por el razonamiento que antecede.
Sin embargo, hay un caso que es completamente distinto y
que no tiene aplicación alguna al presente. El estado de
Washington dispuso que, con el fin de poder figurar en la
papeleta oficial, un candidato debía haber obtenido el 40 por
ciento de los votos depositados en las primarias, pero que si
no se obtenía ese 40 por ciento, entonces debía hacerse la
selección en otra forma. Respecto a este caso, por tanto, el
40 por ciento es una mera cifra, y no tiene relación alguna
excepto en cuanto al resultado de las elecciones primarias
mismas. Además, en el estado de Washington, por virtud de
la misma ley, claramente se reservó el derecho a nombrar
candidatos por convención para aquellos partidos que habían
depositado menos del 10 por ciento de los votos depositados

en las últimas elecciones. Los partidos que obtuvieron más del 10 por ciento tenían derecho a recurrir a las primarias.

Se han emitido varias ideas para explicar las exclusiones a que las legislaturas han acudido. Una de ellas es que a menos que se fije el límite mínimo, cualquier pequeño grupo podría tratar de usurpar el derecho de constituirse en un partido, al igual que, según lo han dicho las cortes en un número de casos, tres sastres de la Calle Tooley se llamaban a sí mismos ''El Pueblo de Inglaterra.'' Sin embargo, cuando un partido puede obtener el 5 o el 10 por ciento del voto total de un estado, no deja de ser una expresión considerable de la opinión pública. Otra idea, desde luego, es la de evitar que se llene demasiado la papeleta oficial, pero cuando una constitución concede el derecho al voto, un número considerable de electores no debe ser excluido por tal fundamento. La mejor opinión ha fijado un límite considerablemente más bajo. El estado de Wisconsin redujo el 20 por ciento del voto del partido al 10 por ciento, y, sin embargo, en un caso en que se puso a prueba la ley, dos jueces disintieron de tal límite. *State ex rel Bentley* v. *Hall,* 178 Wis. 172. Debido a ciertas condiciones locales, el Partido Demócrata dejó de acudir en suficiente número a las primarias. La corte, no obstante, sostuvo el derecho de la Legislatura de fijar un límite mínimo razonable, citando con aprobación el caso de *State ex rel McGrael* v. *Phelps, supra.* La Legislatura probablemente se rigió por la decisión de la corte en el caso de McGrael, y fijó un límite más bajo.

Una vez que el derecho al voto ha sido establecido definitivamente, el derecho del electorado a formar núcleos de opinión pública entre sí es tan sagrado como el derecho al voto. *People* v. *Election Commissioners,* 221 Ill. 9, 97 N. E. 323, 5 A. & E. Ann. Cas. 562; *State ex rel Adair* v. *Drexel,* 105 N. W. 174.

El caso de *Johnson* v. *Grand Forks County,* 113 N. W. (Dakota del Norte) es uno en que, entre otras cosas, la corte

declaró que la Legislatura no podía prescribir requisitos que debía llenar el electorado o los candidatos en adición a los ya fijados por la Constitución, caso que está muy lejos de ser el que nos concierne. La corte citó el caso de *Britton* v. *Board of Commissioners*, 129 Cal. 337, 61 Pac. 1115, 51 L.R.A. 115. En ese caso, la corte, debido, podría decirse, a disposiciones constitucionales locales, declaró inconstitucional una ley de California que fijaba un límite mínimo del 3 por ciento. Aunque la tendencia, en lo esencial, ha sido hacia otra dirección, la opinión del Juez Asociado Sr. Henshaw ha sido citada con frecuencia. El dijo: "Los partidos políticos activos—partidos contrarios al partido dominante,—son, según se ha dicho, esenciales a la existencia misma de nuestro gobierno. No puede negarse el derecho de cualquier grupo de hombres que sostienen credos políticos comunes o principios gubernamentales, de expresar sus ideas por medio de la organización de partidos. . . . No podría sostenerse una ley que impidiera tal organización política o que permitiera que esa organización cayera fraudulentamente en manos de sus adversarios. El proceder de los partidos políticos puede ser reglamentado. La sabiduría del legislador muy bien puede ser ejercida al prescribir medios para poner coto a la corrupción política y al fraude; pero no puede permitirse que, so color de reglamentar, la Legislatura abra de par en par las puertas para que se cometan estos abusos mismos." Entonces la corte de Dakota del Norte citó de la obra del Sr. Wigmore sobre el sistema electoral australiano, lo siguiente: "Pero debe recordarse que en este país puede haberse perdido la esperanza de que salga triunfante un candidato, y, sin embargo, es importante y altamente deseable que tal candidatura figure como un medio de poner de manifiesto la fuerza de un sector del electorado o de determinado movimiento, llamando así la atención de los partidos principales y obligándolos a modificar sus plataformas y su política legislativa."

La Legislatura puede reglamentar, pero no puede tras-

pasar el límite de una reglamentación razonable. Las cortes, podríamos decir que con alguna vacilación, han bajado la cabeza ante la voluntad de la Legislatura cuando, al definir un partido político para los fines de las elecciones primarias, ha fijado un límite mínimo del 10 por ciento del voto total depositado en las elecciones precedentes. Generalmente en esos casos se han dispuesto formas liberales para que un partido esté representado en la papeleta oficial. La Legislatura, sin embargo, no tiene derecho a impedir que un partido exprese su voluntad mediante convenciones, a no ser que ese partido no represente una porción respetable de la comunidad. Por la experiencia en los Estados Unidos, puede decirse que un partido que hubiere depositado en las urnas más del 10 por ciento del voto total en las últimas elecciones es claramente demasiado fuerte para ser excluido. La exclusión que se trata de hacer necesariamente impide que un gran número de las personas con derecho al voto expresen la selección de sus candidatos en la manera normal. Decimos manera normal, porque en Puerto Rico la convención ha sido y es la única forma aceptada para que un partido reconocido pueda expresar su voluntad. No hemos encontrado caso alguno en que un partido, para ser considerado como tal para cualquier fin, haya tenido que exceder del 10 por ciento.

No es respuesta a esto argüir, como lo hizo el interventor, que un partido en minoría puede acudir al remedio de inscribirse por petición, y que el partido del peticionario demostró en la última campaña electoral que podía obtener el 10 por ciento por petición. El sistema de petición generalmente debe ser aplicado a un nuevo partido, o a un partido en decadencia, o a uno que no llegue a un límite razonable reconocido. En Alemania, recientemente treinta partidos políticos acudieron a los comicios. Aun habiendo tres o cuatro partidos políticos principales, cualquiera de ellos fácilmente puede tener menos del 20 por ciento del electorado. Debe permitirse que el pueblo exprese libremente sus ideales

por medio de partidos, a menos que se trate de un caso de *de minimis,* según demuestra la referencia que se hace a los tres sastres de la Calle Tooley. Cuando se exige un número crecido, es difícil la inscripción por petición, la misma está sujeta a ataques, y somete a partidos más pequeños a serios inconvenientes.

La indicación de que actualmente existe en la papeleta oficial una columna independiente, necesariamente no constituye una respuesta a esto. Desde tiempo inmemorial, las ventajas de la candidatura íntegra o de partido son demasiado claras para que haya que comentarlas.

También se hizo la indicación de que la Legislatura de Puerto Rico desea conservar el sistema de grandes partidos. La Legislatura no tiene tal función en una república. El electorado debe tener entera libertad de combinarse y de cambiar su afiliación política cuando le plazca. Puede ser que en el día de hoy ciertos grupos crecidos sean deseables En el mañana, puede ocurrir todo lo contrario.

Tal vez si la ley sobre inscripción por petición hubiese sido más liberal, quizás podría decirse algo en favor del nombramiento de candidatos por petición. La Legislatura no ha creído prudente enmendar la sección 37 que exige el 10 por ciento del voto total, aun mediante petición, a pesar de que se considera crecido, y de que un juez de esta corte en 1924 expresó su criterio de que tal disposición era inconstitucional.

También se ha argumentado, o podría argumentarse, que la disposición relativa al 20 por ciento ha estado en nuestras leyes desde 1906. Nunca había sido atacada, tal vez porque no había habido ocasión para ello, aunque quizá pudo atacársele de acuerdo con la sección 29 de la Ley Foraker. Sea ello como fuere, la presente Carta Orgánica fué aprobada en 1917, y es la Constitución de Puerto Rico, independientemente de las leyes anteriores de nuestra Legislatura.

Para resumir, el derecho al voto está garantizado por la

Carta Orgánica. En Puerto Rico no existen las elecciones primarias. Las primarias son un substituto de las convenciones. Estas continúan siendo en Puerto Rico la forma ordinaria en que los partidos políticos designan sus candidatos. Cualquier serio entorpecimiento del derecho a reunirse en convenciones, entorpece, por tanto, el derecho de los electores legalmente calificados de expresar su voluntad.

Por tanto, nos sentimos obligados a resolver que el requisito del 20 por ciento contenido en la sección 36 es irrazonable y nulo. No es necesario determinar específicamente para todos los casos cuál será el efecto de declarar esta sección inconstitucional. Simplemente resolvemos que el partido representado por el peticionario, y que depositó más del 10 por ciento del voto total emitido en las anteriores elecciones, tiene derecho a nombrar candidatos mediante convenciones.

◼ El Secretario Ejecutivo habló sobre discreción. Desde luego, el Secretario no sólo tendría discreción, sino el deber de negar una solicitud presentada por un peticionario que no represente un partido con derecho a celebrar convenciones. Si, según resolvemos, la sección 36 es inconstitucional, el deber de inscribir es claro. Que el recurso de *mandamus* procede para obligar al Secretario Ejecutivo a hacer esto, se desprende claramente de la Ley de *Mandamus* y de numerosas decisiones, algunas de las cuales hemos citado para otros fines en el curso de esta opinión.

◼ Algo se dijo en las alegaciones, en los alegatos o durante la vista, sobre el hecho de que no se había recurrido al Secretario Ejecutivo para que hiciera una inscripción general del Partido Constitucional Histórico. Sin embargo, si según resolvemos, dicho partido tiene derecho a convocar convenciones y nombrar sus candidatos, el Secretario estaba obligado a inscribir las candidaturas para San Juan. Al presentársele una nueva petición, él estaría obligado a hacerlo así para toda la isla. El ha sido notificado suficientemente por la petición enmendada. En un asunto de esta naturaleza,

en que el Secretario, bajo el consejo del Procurador General, está defendiendo la validez de la sección 36, no es necesario que se le haga un requerimiento expreso. A este respecto véase también el caso de *Martínez Nadal* v. *Saldaña,* 33 D. P.R. 721.

En tal virtud, siendo inconstitucional la sección 36 de la Ley Electoral vigente, es necesario concluir que el Partido Constitucional Histórico tiene derecho a inscribir la candidatura del distrito de San Juan que eligió por convención y en su consecuencia, *que debe expedirse el auto perentorio de mandamus solicitado.*