FRANK A. MARTÍNEZ y JOSÉ ENRIQUE GELPÍ, peticionarios, *v.* LA JUNTA INSULAR DE ELECCIONES, compuesta por C. H. TERRY, como Presidente y de LEOPOLDO FIGUEROA y BOLÍVAR PAGÁN, como vocales, demandados.

No. 275.—*Sometido:* Abril 18, 1932.   *Resuelto:* Abril 29, 1932.

414

*Jorge V. Domínguez, Miguel Guerra-Mondragón, M. A. Martínez Dávila y Manuel A García Méndez,* abogados de los peticionarios; *Bolívar Pagán,* abogado de la demandada Junta Insular de Elecciones.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

Los peticionarios alegan haber sido designados por el Or-

ganismo Central Directivo del Partido Liberal Puertorriqueño como observador y observador sustituto respectivamente de tal Partido con voz y voto en la Junta Insular de Elecciones; que dicho Partido es un partido político debidamente inscrito en la Secretaría Ejecutiva de Puerto Rico, con candidaturas generales y locales en toda la Isla, incluyendo la de Comisionado Residente en Wáshington, y con 42,204 electores, que constituyen más del 15 por ciento del número total de electores capacitados que votaron en las últimas elecciones generales para Comisionado Residente; que el Partido Liberal Puertorriqueño llevó a cabo, previa convocatoria de su Comité Directivo, una asamblea magna o convención en que se ratificaron las candidaturas inscritas por petición en la Secretaría Ejecutiva y se adoptó el programa político y económico del Partido, así como su reglamento; que el demandado Chas. H. Terry, Superintendente General de Elecciones, y los otros demandados, Bolívar Pagán, en representación del Partido Socialista y Leopoldo Figueroa en representación del Partido Unión Republicana, componen la Junta Insular de Elecciones según está actualmente constituída; y, por información y creencia que los Partidos Socialista y Unión Republicana tienen concertado un pacto electoral que los convierte de hecho en un solo partido con doble representación en dicha Junta Insular de Elecciones.

Se solicita se declare que la sección primera de la vigente Ley Electoral y de Inscripciones, según quedó enmendada en 1924 (Leyes de ese año, pág. 3) es nula, anticonstitucional e ineficaz en cuanto a ciertos requisitos del *disponiéndose* que aparece en la misma, así como que se dicte un auto perentorio de *mandamus* ordenando a la Junta Insular de Elecciones a reconocer a los peticionarios como observador y observador sustituto, respectivamente, con voz y voto como representantes del Partido Liberal Puertorriqueño en dicha Junta.

■ La Sección de referencia lee en parte como sigue:

"Se establece una junta permanente de elecciones que se com-

pondrá de un Superintendente General de Elecciones, como presidente, quien será designado por el Gobernador, con el consejo y consentimiento del Senado de Puerto Rico, y de dos personas representando los dos partidos políticos principales de la Isla según más adelante se definen en la presente, y de un substituto de cada uno de dichos miembros, que serán nombrados por el Gobernador a propuesta de los organismos directivos centrales de dichos partidos; *Disponiéndose, no obstante,* que el organismo directivo central de cualquier partido político cuyo candidato para Comisionado a los Estados Unidos hubiese obtenido veinte por ciento o más del total de votos depositados en las urnas para aquel cargo en las precedentes elecciones, tendrá el derecho de nombrar un representante y un substituto que será designado por el nombre de 'observador,' quien disfrutará de todos los derechos y privilegios de los miembros de dicha junta, y tendrá voz, pero no voto en sus deliberaciones y decisiones.''

El caso de *Martínez Nadal* v. *Saldaña,* 38 D.P.R. 446, en que descansan los peticionarios, no resuelve la cuestión ante nos. La mayoría de las otras autoridades citadas por los peticionarios enuncian principios generales de derecho constitucional y de hermenéutica legal. Ninguna de ellas tiende claramente hacia la conclusión de que un estatuto que crea una junta de elecciones y confiere representación ''bipartidista'' a los dos partidos políticos principales es inconstitucional por ser una restricción irrazonable del derecho al sufragio ó por alguna otra causa, toda vez que no extiende el privilegio de representación a todos los partidos políticos. La fraseología del *disponiéndose* es perfectamente clara. No deja lugar a dudas ni da margen a interpretaciones. El derecho a nombrar un observador es conferido a ''el organismo directivo central de cualquier partido político cuyo candidato para Comisionado a los Estados Unidos hubiese obtenido veinte por ciento o más del total de votos depositados en las urnas para aquel cargo en las precedentes elecciones,'' no a la organización directiva central de cualquier partido político organizado por petición y convención con o sin determinado número de electores capacitados que votaron en las elecciones precedentes. La aseveración de que tal observador ''ten-

drá voz pero no voto'' en las deliberaciones y decisiones de la Junta es igualmente inequívoca.

■■ Se presume que el estatuto es constitucional. De ser inconstitucional, incumbe a los peticionarios establecer ese hecho. La petición y las autoridades citadas en apoyo de la misma no demuestran que el *disponiéndose* de que se trata o la sección en su totalidad equivalgan a una reglamentación del ejercicio de la franquicia electoral o que tal reglamentación sería inconstitucional por equivaler a un entorpecimiento indebido del derecho al sufragio. Enfocado desde cualquier otro ángulo el precepto puede o no ser irrazonable, absurdo, arbitrario o injusto. No está dentro de las atribuciones o potestad de este tribunal modificar o enmendar la ley mediante legislación judicial a guisa de interpretación estatutaria. Véase 25 R.C.L. págs. 1018, 1019, 1022, 1024 y 1027 citado por los peticionarios.

Véase además 9 R.C.L. 1013, 1014, sección 33, 20 C. J. 92, sección 73; idem 91, sección 70.

Ninguno de los miembros de esta corte duda de lo deseable que es llevar a un representante del Partido Liberal Puertorriqueño a la Junta Insular de Elecciones como observador. Esto no puede hacerse bajo la ley tal y como ahora rige. La cuestión de una enmienda, ya sea como cuestión de juego limpio o como una garantía adicional de una elección honrada e imparcial, es, repetimos, cuestión que incumbe a la legislatura.

Prueba plena de la alegación relativa a la existencia de un entendido entre los dos partidos principales, equivalente a una fusión, presentaría quizá una cuestión más seria. Es obvio que en la ley vigente la legislatura dejó de prever o de adoptar disposición alguna para tal posibilidad. No vemos cómo esta corte podría suplir la omisión. No obstante, si los peticionarios están preparados para probar el pacto alegado, se les dará, previa solicitud suya, la oportunidad de hacerlo así y de demostrar, si pueden, que tienen derecho al auto

por este fundamento. Si no se presentara moción alguna dentro de tres días, se declarará sin lugar la petición.

### EN MOCION DE RECONSIDERACION Y PRORROGA

Mayo 31, 1932.

Los peticionarios nos piden ahora una nueva vista, la oportunidad de presentar alegato, y una prórroga de tiempo para ofrecer evidencia en apoyo de la alegación respecto a la existencia de un pacto electoral.

El primer fundamento de la moción es que, al terminar la vista del 18 de abril, esta corte concedió sólo 24 horas para la radicación de un memorándum de autoridades y no dió a las partes la oportunidad de someter alegatos. Este caso fué señalado originalmente para abril 21. Los peticionarios comparecieron inmediatamente y solicitaron que se adelantara la vista para el 18 de abril. Así se ordenó. Debieron estar preparados para presentar su caso para aquel entonces. Nada dijeron en punto a alegatos, como tampoco solicitaron más de 24 horas para radicar memorándum. Un alegato hubiera sido objeto de cordial acogida, y todo el tiempo necesario para su preparación hubiera sido otorgado a solicitud.

El segundo motivo de la moción es que, a causa del transcurso de dieciocho días entre la vista y el fallo, el tribunal no podía recordar los principales argumentos en que se basaron los peticionarios, y, por ende, no consideró la cuestión principal. Esta contención se consigna nuevamente en más palabras como el tercero y cuarto motivos de la moción.

■■ A los peticionarios los representaron en la vista tres abogados. Uno de ellos, el primero en dirigirse al tribunal, planteó la teoría que ahora nuevamente se expone como los fundamentos segundo, tercero y cuarto de la moción de reconsideración. Es, en síntesis, que las secciones 1 y 13 de la Ley Electoral no regulan, ni pueden regular, los derechos de los partidos políticos, porque éstos no existen ni están reconocidos como entidades con personalidad jurídica o civil distinta a los electores que los constituyen; que los electores,

como partes constitutivas de los partidos políticos, y el derecho de tales electores al voto, son los únicos que pueden ser objeto de reglamentación; y que si la ley regula el derecho al sufragio, no los derechos de los partidos políticos organizados por petición o convención o en alguna otra forma, un grupo de electores capacitados que votaron en las precedentes elecciones para el cargo de Comisionado Residente, al agruparse después bajo cualquier nombre común están, ante los ojos de la ley (*in contemplation of law*), dentro del espíritu y significado del estatuto, y debe estimarse que ha habido por su parte un cumplimiento substancial del requisito relativo a los votos depositados en las elecciones precedentes, para tener esos electores derecho a estar representados en la Junta Insular de Elecciones.

El caso fué sometido y discutido oportunamente, y con posterioridad se eligió al infrascrito para redactar un memorándum que se adoptó después como la opinión del tribunal. Antes del turno final, que se hizo dentro de la semana anterior a la fecha de la opinión, la corte había considerado y descartado la teoría de los peticionarios arriba bosquejada. Ni había olvidado ni pasó por alto la argumentación de los señores letrados. Antes de poderse llegar a una conclusión definitiva, sin embargo, los abogados de los peticionarios habían hecho indagaciones sobre el caso. Esto daba la impresión de que los peticionarios interesaban una pronta determinación de la controversia principal más bien que una discusión cabal de todos y cada uno de los puntos presentados.

Las únicas autoridades citadas por los peticionarios en su memorándum en apoyo de la teoría arriba esbozada fueron los casos de *Barceló* v. *Saldaña,* 42 D.P.R. 254, y *Martínez Nadal* v. *Saldaña,* 38 D.P.R. 463. Ninguna otra se menciona en la moción de reconsideración. La opinión en el caso de *Barceló* v. *Saldaña* contiene un extracto del de *Davis* v. *Hambrick,* 58 S. W. 779, 780, y otro del de *Morrow* v. *Wipf,* 115 N. W. 1121, 1126 y 1127. Lo que la corte resolvió en

*Davis* v. *Hambrick* está correctamente expresado en el sumario, así:

"Como los tribunales no tienen la potestad de intervenir con el criterio del más alto tribunal de un partido político en una materia que envuelve el régimen del partido, la decisión del comité central del Partido Republicano en el sentido de que ciertas personas constituían el comité ejecutivo republicano de cierto condado, y de que determinado miembro de ese comité era su presidente, es final y concluyente."

El extracto de *Morrow* v. *Wipf,* se explica por sí mismo. Helo aquí (bastardillas nuestras):

". . . Los partidos políticos no son criaturas de la ley. Existen independientemente de los estatutos; y tienen poderes inherentes para reglamentar sus propios asuntos *sólo con sujeción a aquellas restricciones legislativas* que hayan sido legalmente promulgadas. . . . .
. ". . . Los partidos políticos surgen de la asociación voluntaria de los electores. No existen por ministerio de la ley; y poseen plenos poderes en cuanto a sus propios asuntos *á falta de reglamentación legislativa.*"

Expresiones similares y varias definiciones. pueden hallarse en 49 C. J. 1074, 1075 y 1076, sección 15, donde se dice, entre otras cosas, que "en ausencia de una definición estatutaria, puede acudirse a la significación generalmente aceptada del término, . . . . ." y que "a falta de precepto legislativo, un partido político se rige por sus propios usos y establece sus propias reglas."

No precisamos sutilizar acerca del significado de palabras y frases. La Ley Electoral y de Inscripciones no define las palabras "partido político." Por virtud de los términos de la sección 14, "partidos principales" son "los dos partidos políticos cuyos candidatos para Comisionado a los Estados Unidos obtuvieron el mayor número de votos, en primero y segundo término, depositados para aquel cargo en las precedentes elecciones." El "partido de la mayoría," es "el partido político cuyo candidato para Comisionado a los Estados Unidos obtuvo el mayor número de votos para candi-

dato para dicho cargo en las elecciones precedentes." Un "partido organizado" es aquel "partido político cuyo candidato para Comisionado a los Estados Unidos obtuvo un veinte por ciento o más de la totalidad de votos para todos los candidatos para aquel cargo en las elecciones precedentes." Aquí y en la sección primera la legislatura trata de partidos políticos como tales, no con el elector individual directamente. Aquéllos se clasifican con arreglo a la pujanza que se demuestre por el resultado de las elecciones anteriores. Las palabras "grupo de electores" o "asociación de electores" pueden substituirse doquiera se usen las palabras "partido político." Un mero juego de palabras no puede afectar el resultado. Los hechos son inflexibles.

La sección primera provee representación "bipartidista" en la Junta de Elecciones. Esta representación se confiere a los dos partidos principales. Cualquier partido político "cuyo candidato para Comisionado a los Estados Unidos hubiese obtenido" determinado tanto por ciento "del total de votos depositados en las urnas para aquel cargo en las precedentes elecciones," tiene derecho a un observador. "Un grupo de electores capacitados que votaron en las elecciones precedentes para Comisionado a Wáshington," y que se unieron después bajo un nombre común, no están, "ante los ojos de la ley, dentro del espíritu y significado del estatuto," y tal votación y organización subsiguiente no pueden "estimarse como un cumplimiento substancial" del requisito estatutario, porque lo que el estatuto tiene por mira y exige es que tal grupo de electores haya tenido un candidato común para Comisionado Residente en las precedentes elecciones, y no que un partido político posteriormente organizado deba componerse de electores que votaron a favor o en contra del candidato de algún otro partido político en las elecciones anteriores. El núcleo de electores conocido como el Partido Liberal Puertorriqueño no había surgido cuando se celebraron las últimas elecciones generales y, por consiguiente, como tal nú-

cleo, jamás ha tenido candidato para Comisionado Residente. En realidad resolvimos la cuestión que los peticionarios dicen ahora que no fué decidida por nuestra anterior opinión cuando en la misma dijimos que:

"La fraseología del *disponiéndose* es perfectamente clara. No deja lugar a dudas ni da margen a interpretaciones. El derecho a nombrar un observador es conferido a 'el organismo directivo central de cualquier partido político cuyo candidato para Comisionado a los Estados Unidos hubiese obtenido veinte por ciento o más del total de votos depositados en las urnas para aquel cargo en las precedentes elecciones,' no a la organización directiva central de cualquier partido político organizado por petición y convención con o sin determinado número de electores capacitados que votaron en las elecciones precedentes."

El quinto fundamento de la moción es que este tribunal consideró el caso de Martínez Nadal v. Saldaña, *supra,* como inaplicable aunque en aquel caso había resuelto que la reglamentación de la franquicia electoral debe ser razonable y que la exigencia del 20 por ciento como requisito previo al derecho de un partido organizado por petición a nominar candidatos, era inconstitucional. Es inconcebible—dicen los abogados de los peticionarios—que una disposición estatutaria sea inconstitucional por impedir que el Partido Constitucional Histórico participe en las elecciones, y que una disposición parecida en la misma ley dejando huérfano al Partido Liberal Puertorriqueño de representación en la Junta de Elecciones, sea constitucional. Estamos harto conformes con los abogados en que al determinar qué tanto por ciento ha de fijarse por la legislatura como mínimo, la misma vara de medir debe usarse en ambos casos. Si se puede o no hacer alguna distinción entre el derecho a nominar candidatos, ya por petición, ya por convención, y el derecho a representación en la Junta Insular de Elecciones, es otra cuestión. Nuestra opinión anterior, sin embargo, no hizo semejante distingo. La sección 36 de la Ley Electoral, tal como fué enmendada en 1923, dispone que "Cualquier partido político

que hubiere depositado más del veinte (20) por ciento del voto total de la Isla para Comisionado a Wáshington en las precedentes elecciones generales, tendrá derecho a nombrar candidatos por medio de convenciones debidamente convocadas.'' Esa fué la disposición que consideramos en el caso de Martínez Nadal. El Partido Constitucional Histórico había depositado más del 10 por ciento de la votación total de la Isla para Comisionado a Wáshington en las elecciones generales precedentes. No se suscitó la cuestión de la constitucionalidad del requisito relativo a participación en las elecciones generales precedentes como condición previa a la nominación de candidatos por convención. Lo que este tribunal resolvió fué que el extremo respecto al 20 por ciento del requisito era irrazonable y, por tanto, anticonstitucional, y que habiendo el Partido Constitucional Histórico obtenido más del diez por ciento del voto total depositado en las urnas de las elecciones anteriores, tenía derecho a nominar candidatos por convención. Volviendo ahora al caso de autos, la corte no dijo ni quiso significar implícitamente en su opinión anterior que la doctrina del caso de Martínez Nadal era inaplicable al aspecto del 20 por ciento del *disponiéndose* de la sección primera. Contrariamente, asumió sin resolverlo en forma expresa que el requisito del 20 por ciento contenido en el *disponiéndose* era irrazonable y, por ende, inconstitucional. En otras palabras, asumió, sin declararlo expresamente, que si el Partido Liberal Puertorriqueño hubiera nominado candidato para Comisionado a los Estados Unidos y si tal candidato hubiera recibido el 17 por ciento, o aun un tanto por ciento menor, del total de votos depositados para los candidatos a ese cargo en las elecciones de 1928, los peticionarios entonces habrían tenido derecho a un puesto en la Junta Insular como observadores. La cuestión es que aunque el Partido Liberal Puertorriqueño hubiera logrado las firmas de más del 20 por ciento de los electores que votaron para Comisionado a los Estados Unidos en las elecciones preceden-

tes, aun así no tendría derecho a representación en la Junta Insular de Elecciones al amparo de las disposiciones de la sección primera. Lo que el tribunal dijo en su previa opinión fué que el caso de *Martínez Nadal* v. *Saldaña* no resolvía la cuestión que estaba considerando. Nada hay en la moción de reconsideración que indique que el tribunal se equivocó.

El sexto fundamento de la moción es que esta corte dejó de aplicar la regla de hermenéutica de que cuando una ley es susceptible de dos interpretaciones, una contraria a un derecho reconocido por la Carta Orgánica, y otra favorable a tal derecho, la última debe prevalecer. A esto sigue la aseveración de que el elector tiene un derecho constitucional incuestionable a representación en la Junta Insular de Elecciones como un incidente de su derecho al libre ejercicio de la franquicia electoral, a fin de garantizar unas elecciones honradas e imparciales. El objeto y fin de toda interpretación estatutaria es determinar el significado del estatuto de que se trate. Cuando ese significado lo expresa la Legislatura misma en términos claros e inequívocos, no hay margen ni excusa para interpretaciones. El tribunal dijo en su primera opinión que la fraseología del *disponiéndose* era perfectamente clara, y que no dejaba lugar a dudas ni daba margen a interpretaciones. Ello no obstante, los abogados de los peticionarios aun asumen (según lo han hecho desde el principio, sin tratar de demostrarlo) que esto no es así. Tal como han hecho desde un principio, ellos continúan asumiendo, sin intentar probarlo, que el elector tiene un derecho constitucional a ser representado en la Junta de Elecciones. Esto puede o no ser cierto. No habiéndose demostrado nada a este respecto, no estamos preparados para asumir con los abogados que la representación individual o de partido en la Junta de Elecciones es el único medio posible de garantizar unas elecciones razonablemente justas e imparciales.

Según hemos demostrado, dos de los miembros de la Junta Insular de Elecciones representan a los dos partidos principales. Cada uno de esos dos miembros es designado por el Gobernador por recomendación de su partido. El Presidente lo nombra el Gobernador con el consejo y consentimiento del Senado. Los tres pueden ser destituídos por el poder nominador. A tenor de los términos de la sección 32 de la ley, toda persona cuya inscripción como elector haya sido cancelada, puede acudir a las cortes. La sección 89 dispone que el resultado del escrutinio de una elección puede ser revisado mediante *certiorari*. Una ley aprobada el 4 de mayo de 1931 (Leyes de ese año, página 449) prescribe el procedimiento para impugnar ''la elección de funcionarios, excepto los miembros de la Legislatura y el Comisionado a los Estados Unidos.''

Puede admitirse que el derecho al voto lleva consigo el derecho a que ese voto se cuente en favor de los candidatos para quienes fué depositado. Puede darse por sentado que la maquinaria provista por la ley para conducir las elecciones deja mucho que desear, que vale más precaver que tener que remediar, y que la presencia de un observador en representación de cada partido político cuyo nombre aparezca en la papeleta electoral, sería un medio efectivo de garantizar unas elecciones justas e imparciales. No se desprende que el dejar de proveer respecto a tal observador sea un impedimento material del derecho al sufragio. ¿Puede cualquier miembro de la Junta Insular de Elecciones obtener la eliminación de un nombre de las listas de inscripción, o de un voto del escrutinio oficial, salvo mediante colusión y con la connivencia de algún otro miembro? ¿Demuestran los hechos ante nos que los dos partidos adversarios ya representados en la Junta de Elecciones tienen un interés común de lisiar a un partido político nuevamente formado que no esté representado? ¿Puede este tribunal asumir con seguridad que los dos miembros de la junta nombrados por el Gobernador por recomen-

dación de los dos partidos principales coadyuvarían en la realización de ese designio? ¿Puede asumir que en tal caso la nueva organización no hallaría voz y voto en la protesta del presidente? Si cualquiera o todos los miembros resultaren corruptos, ¿se negaría a actuar el Ejecutivo? ¿Son los recursos de apelación, *certiorari* e impugnación inadecuados?

Tales son algunas de las cuestiones envueltas en la cuestión más amplia respecto a si la Ley Electoral y de Inscripciones, considerada en conjunto, fija cualquier limitación irrazonable sobre el ejercicio de la franquicia electoral. Ninguna de ellas ha sido discutida adecuadamente por los abogados de los peticionarios. La mayor parte de ellas no han sido mencionadas.

El sétimo motivo de la moción es que esta corte no resolvió y dejó en duda las cuestiones relativas a si la reglamentación envuelta en las secciones 1 y 13 es irrazonable, absurda, arbitraria, desigual e injusta. Los letrados alegan que, fuera de cualquiera cuestión de inconstitucionalidad, la decisión de estas cuestiones es fundamentalmente necesaria a fin de determinar los derechos políticos de los peticionarios, "que constituyen un grupo considerable de opinión." Esta corte, dicen ellos, pudo haber resuelto que aunque la legislatura tiene la facultad de reglamentar, tal reglamentación no puede ser desde ningún ángulo irrazonable, o absurda, o arbitraria, o desigual, o injusta. Las únicas autoridades citadas por los peticionarios en su memorándum original en apoyo de esta contención fueron 25 R.C.L. 1018, 1019, 1022, 1024 y 1027; y *State Ex Rel McGrael* v. *Phelps*, 35 L.R.A. (N.S.) 353. En la moción de reconsideración no se citan otras autoridades. Examinando el tomo 25 de Ruling Case Law en las páginas indicadas, leemos:

"256. *Irrazonabilidad.* Una de las reglas establecidas para la interpretación de estatutos es que éstos deben recibir una interpretación racional y sensata, en caso de que su significado sea dudoso. Cuando la fraseología de un estatuto lo permita, debe evitarse una

interpretación que conduzca a un resultado irrazonable. . . . . La regla contraria a que se dé una interpretación irrazonable a un estatuto, está, desde luego, sujeta a la limitación de que si la fraseología usada en la ley necesariamente prohibe cualquiera otra interpretación que no sea la de llevar a un resultado absurdo, la corte está en el deber de adoptar y de hacer cumplir tal interpretación.

"257. *Absurdo.* Si bien la legislatura puede aprobar legislación absurda si así lo deseare, antes de que una corte adopte una interpretación que conduzca a un absurdo, deberá investigar si no hay otra interpretación posible que no lleve a tal resultado. Si la fraseología usada permite dos interpretaciones y de acuerdo con una de ellas el estatuto es absurdo, si no dañino, mientras que de conformidad con la otra es razonable y beneficioso, debe evitarse aquella interpretación que conduzca a resultados absurdos. . . Empero, cuando el significado aparentemente absurdo es indudablemente el verdadero, la ley debe subsistir con tal significación o caer totalmente. Por absurdo se quiere decir aquello que deba ser considerado como moralmente imposible, que es contrario a la razón, o, en otras palabras, que no puede atribuírsele al hombre en el uso de sus sentidos. Si bien una interpretación literal de un estatuto no debe seguirse cuando la misma conduce a una consecuencia absurda, el hecho de que el efecto del estatuto en la forma en que se aplica a determinado caso pueda no ser equitativo, no lo convierte en absurdo en tal forma que justifique una desviación de su claro significado.

"258. *Opresión o injusticia.* Debe presumirse que no fué la intención de la legislatura que una ley resultara opresiva o injusta, y es regla de interpretación razonable y sabia resolver cualquier cuestión ambigua o absurda en un estatuto en favor de una aplicación justa y equitativa de la ley. Los términos empleados por la legislatura no han de recibir una interpretación que esté en conflicto con los principios reconocidos de justicia, si a ellos puede dárseles otro significado que esté en consonancia con aquellos principios. Es regla universal en la interpretación de estatutos que si puede determinarse con claridad el espíritu de la ley, éste debe prevalecer sobre la letra del mismo, y esto es especialmente cierto cuando las palabras precisas, de ser interpretadas en su significado corriente, conducen a una injusticia manifiesta. . . . . Pero cuando el lenguaje del estatuto es claro y libre de toda ambigüedad y clara su intención, la corte está en el deber de interpretar el estatuto en la forma en que ha sido promulgado, aun si tiene por consecuencia una opresión o injusticia, especialmente cuando tal opresión o in-

justicia resulta ocasional y excepcional. . . . . Una vez se adujo que las cortes podían mitigar el rigor de estatutos severos, adoptando una regla de interpretación equitativa por virtud de la cual podían introducirse excepciones a tales estatutos. Pero la proposición, no importa cómo haya sido una vez resuelta o considerada, de que las cortes, en lo que se considera como interpretación equitativa o algo así, pueden, contrario a la letra clara de un estatuto y contrario a la intención claramente expresada por su fraseología, mitigar la 'violencia de la letra del estatuto,' introduciendo excepciones que el estatuto mismo no contiene, a fin de remediar la situación en casos de severidad o de inconveniencia, ha sido rechazada desde hace mucho tiempo y muy frecuentemente para que ahora sea objeto de seria argumentación o dudas. Tal doctrina, si alguna vez existió, fué posteriormente rechazada y la regla reconocida ahora universalmente y aplicada es que no importa lo que se haga con la letra de un estatuto, a ésta no puede, según lo expresa Lord Bacon. atribuírsele una intención repugnante.

''\* \* \* \* \* \* \*

''\* \* \* \* \* \* \*

''261.—*Consecuencias perjudiciales o desastrosas en general.*—Si la fraseología es clara y la intención manifiesta, no existe, desde luego, campo para las presunciones. Pero si por otra parte el lenguaje no es claro y es obvio que, mediante determinada interpretación de un caso dudoso, grandes intereses públicos serían puestos en peligro o sacrificados, la corte no debe presumir que fué la intención de los redactores de la ley darle tal interpretación. Un estatuto no será interpretado en forma tal que equivalga a un daño público, a menos que sus palabras claras e inequívocas así lo exijan especialmente si el estatuto ha de servir a intereses particulares. . . . . Ningún estatuto debe ser interpretado en forma tal que proteja un fraude, pues no debe presumirse que tal fué el propósito de la Legislatura. Mas aunque determinada interpretación pueda alentar prácticas fraudulentas, el deber de la corte termina al interpretar el estatuto en armonía con el objeto manifiesto del legislador.''

Si hubiese alguna duda respecto al significado de las secciones 1 y 13, las reglas de interpretación estatutaria aquí invocadas por los peticionarios quizá exigirían que se tomara en consideración la cuestión relativa a irrazonabilidad, absurdo, arbitrariedad, desigualdad o injusticia. No son aplicables, porque conforme hemos resuelto la fraseología de la

ley no da lugar a interpretación estatutaria. Si la ley es o no inconstitucional por entorpecer irrazonablemente el ejercicio de la franquicia electoral, es otra cuestión. En ausencia de prueba satisfactoria en relación con el menoscabo de cualquier derecho garantizado por la Carta Orgánica, esta corte no tiene facultad para substituir con su criterio el de la legislatura respecto a cuál debe ser la ley. Así pues, en nuestra opinión anterior, después de indicar que los peticionarios habían dejado de demostrar que la ley era nula por ser una restricción irrazonable del derecho al sufragio, resolvimos definitivamente la cuestión que los peticionarios aun insisten no fué resuelta, cuando dijimos:

". . . Enfocado desde cualquier otro ángulo el precepto puede o no ser irrazonable, absurdo, arbitrario o injusto. No está dentro de las atribuciones o potestad de este tribunal modificar o enmendar la ley mediante legislación judicial a guisa de interpretación estatutaria."

No creímos necesario agregar en aquel entonces que el caso de Phelps no tiene conexión alguna con la cuestión aquí presentada. En tanto en cuanto dicho caso se relacione con la cuestión de razonabilidad o irrazonabilidad del requisito estatutorio de que un nuevo partido político deberá haber demostrado su pujanza en una elección anterior antes de tener derecho a un observador en la Junta Insular de Elecciones, el mismo tiende a sostener lo razonable de tal requisito.

El octavo fundamento de la moción es que esta corte no resolvió la cuestión fundamental relativa a si merced a una interpretación racional del estatuto los peticionarios tenían derecho a un observador con voz pero sin voto. Esto es tan sólo un prefacio a la aseveración adicional de que es regla bien conocida que una corte puede conceder menos de lo que se le pide aun en un procedimiento de mandamus, conforme se hizo en el caso de Martínez Nadal v. Saldaña, *supra*. Desde luego, según ya hemos indicado, si el Partido Liberal Puertorriqueño hubiese nominado y votado por un Comisio-

nado Residente en las precedentes elecciones, tal cual lo hizo el Partido Constitucional Histórico en el caso de Martínez Nadal, entonces esta corte hubiese librado nuevamente un auto. Ninguna parte del remedio solicitado pudo ser concedida a los peticionarios porque éstos dejaron de colocar su caso dentro del requisito estatutario esencial que no está sujeto a interpretación y dejaron además de demostrar que dicho requisito estatutario es inconstitucional.

El noveno motivo de la moción es que esta corte debió haber resuelto la cuestión de constitucionalidad o que debió haber dado una interpretación racional al estatuto aun si las autoridades citadas por los peticionarios solamente enunciaban principios generales de derecho constitucional y de interpretación estatutaria. Aquí los letrados de los peticionarios invocan el artículo 7 del Código Civil que dispone que "El tribunal que rehuse fallar a pretexto de silencio, obscuridad o insuficiencia de la ley, o por cualquier otro motivo, incurrirá en responsabilidad." Esta corte resolvió la cuestión de constitucionalidad en lo que al presente caso se refiere al decir que la ley se presume constitucional y que los peticionarios habían dejado de destruir esa presunción. Las reglas de interpretación estatutaria, repetimos, no tienen aplicación a un caso en que no hay cuestión alguna de interpretación estatutaria.

Los letrados de los peticionarios no hubieran tenido motivo para quejarse si la moción de reconsideración hubiese sido denegada sin exponer los fundamentos de tal negativa. La respuesta obvia a la solicitud de permiso para radicar alegato sería que se ha hecho tardíamente, y a la solicitud de prórroga para ofrecer evidencia en torno a la existencia de un pacto electoral, que los peticionarios debieron haberse aprovechado de la oportunidad que ya se les había dado. Ello no obstante, se les permitirá radicar su alegato y se les concederá otra oportunidad para demostrar, si pueden, la existencia de un pacto electoral.